# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No. 3:14-cr-00146-SI |
| v. | **OPINION AND ORDER** |
| **ERIC GOODPASTER**, | |
| Defendant. | |

S. Amanda Marshall, U.S. Attorney, and Jennifer J. Martin and Craig J. Gabriel, Assistant U.S. Attorneys, District of Oregon, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Attorneys for United States.

Harold P. DuCloux III and Gerald M. Needham, Assistant Federal Public Defenders, 101 S.W. Main Street, Suite 1700, Portland, OR 97204. Attorney for Defendant.

**Michael H. Simon, District Judge.**

Eric Goodpaster ("Goodpaster" or "Defendant") is charged with two counts of mail theft under 18 U.S.C. § 1709. Goodpaster was indicted by a grand jury on April 8, 2014, and questioned the next day, April 9, 2014. He now moves to suppress all statements he made during that interview. He argues that his statements were coerced and involuntary; that he was interrogated in custody without first being advised of his Fifth Amendment rights; that the government, as his employer, threatened to punish him for relying on his Fifth Amendment

rights, thereby creating a "penalty situation"; and that he was denied his Sixth Amendment right

to counsel. On October 29, 2014, the Court held an evidentiary hearing and oral argument to

resolve the parties' factual disputes and clarify their legal arguments. Many of Goodpaster's

arguments are without merit. For the reasons that follow, however, Goodpaster's motion to

suppress is granted, based on his "penalty situation" argument under *Garrity v. New Jersey*, 385

U.S. 493 (1967), and its progeny.

## FINDINGS OF FACT

At the evidentiary hearing on October 29, 2014, the Government called three witnesses:

Special Agent ("SA") Louis Nalepa of the United States Postal Service ("USPS" or "Postal

Service") Office of Inspector General ("OIG"); SA Corey Byrd, also of the USPS OIG; and SA

Dana Epperson, of the United States Department of Veterans Affairs OIG. Goodpaster called

four witnesses: Michele Grigorioff, president of the Portland branch of the National Association

of Postal Supervisors ("NAPS"); Joseph Lahmann, president of the Oregon branch of NAPS; Jeff

Harmon, who was a USPS customer service supervisor at the Detached Carrier Unit ("DCU") in

Clackamas, Oregon, when Goodpaster was questioned; and Jami Goodpaster, Eric Goodpaster's

wife and a postmaster at the Corvallis Post Office. Eric Goodpaster did not testify.

Based on the evidentiary hearing, the Court makes the following findings of fact:

1.  This case arose out of a USPS OIG investigation into the theft of parcels
    containing prescription drugs mailed to veterans from the U.S. Department of
    Veterans Affairs.

2.  The USPS OIG is an independent investigative agency with authority over
    internal affairs within the Postal Service. The USPS OIG investigates violations
    of both internal USPS rules and criminal laws. The USPS OIG derives its
    investigative powers from both the administrative authority of the USPS and from

federal law-enforcement authority. It reports its findings to postal management and, when appropriate, to prosecuting officials.

3. The investigation of Eric Goodpaster began at least as early as February 20, 2013. At that time, Goodpaster was a customer service supervisor at the Salem Hollywood DCU in Oregon. At some point previously, including in October 2009, Goodpaster was either a postmaster or an officer in charge at the post office in Philomath, Oregon.

4. At some point between February 2013 and April 9, 2014, the date of the interview, the case was transferred from SA Irene Brown to SA Louis Nalepa of the USPS OIG. Also during that time, Goodpaster began working at the Clackamas DCU.

5. Several months before the interview, SA Nalepa placed surveillance cameras in the mail sorting room at the Clackamas DCU. For several months, cameras recorded Goodpaster taking parcels from the "left-notice" shelf and then walking directly into his office with them. In March 2014, SA Nalepa placed surveillance cameras in Goodpaster's office. A week later, when Goodpaster discovered the cameras, SA Nalepa removed them.

6. On April 8, 2014, a federal grand jury indicted Goodpaster for two counts of mail theft, and a warrant was issued for his arrest.

7. On April 9, 2014, Goodpaster was working as the officer in charge at the Clackamas DCU. At 10:46 a.m., three agents—SA Nalepa, SA Byrd, and SA Epperson—entered Goodpaster's office. They were dressed in casual clothing with sidearms concealed. A fourth agent, SA Julie Walt, waited outside.

8.  SA Nalepa led the interview, while SA Byrd took notes. SA Epperson was on hand to assist with any matters pertinent to the U.S. Department of Veterans Affairs.

9.  The agents began by identifying themselves. SA Nalepa and SA Epperson testified that SA Nalepa then informed Goodpaster that he had been indicted. SA Byrd testified that he did not recall that having happened, and his notes do not reflect that information being given to Goodpaster.

10. Soon after entering, SA Nalepa handed Goodpaster a document informing him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). SA Nalepa read aloud each of the enumerated rights and had Goodpaster place his initials next to each right stated on the form to indicate that he understood it. At the end of the process, Goodpaster, SA Nalepa, and SA Byrd all signed and dated the form. In addition, SA Nalepa and SA Byrd marked the time as 10:51 a.m. Dkt. 33, Gov. Ex. 1.

11. Shortly thereafter, Goodpaster indicated that he wanted "to take [the matter] to [the] MSPB board." Dkt. 33, Gov. Ex. 5 (notes of SA Byrd). The MSPB is the Merit Systems Protection Board, an independent, quasi-judicial agency to which federal civil servants can appeal disciplinary actions and adverse employment decisions.

12. SA Nalepa was unsure what Goodpaster was requesting—legal counsel, a union representative (to which he was entitled upon request, under the union contract), or something else. SA Nalepa informed Goodpaster that Goodpaster was free to request assistance but that SA Nalepa could not give Goodpaster advice. Goodpaster did not explain himself further or pursue the matter at that time.

13. The interview proceeded for approximately one hour. SA Nalepa and SA Byrd described to Goodpaster the evidence they had amassed against him, including the video evidence. SA Epperson informed Goodpaster of the consequences of his thefts on other veterans who needed their prescription medicines. Goodpaster was remorseful and explained that he had injuries from his own military service that caused him pain. He confessed that he had become addicted to his medication and, approximately a year and a half ago, had begun stealing packages from the mail that contained medications belonging to and intended for others.

14. At some point during the interview, SA Nalepa informed Goodpaster that his wife, Jami Goodpaster, was also being interviewed in connection with the thefts.

15. At another point during the interview, the questioning was interrupted by SA Walt, knocking at the door. With her was Jeff Harmon, Goodpaster's coworker, who was relaying a request from Michele Grigorioff, an NAPS representative, to speak to Goodpaster about representation. SA Nalepa informed Mr. Harmon that Goodpaster had not personally asked for an NAPS representative and that Ms. Grigorioff's request was therefore denied.

16. At the end of the interview, SA Nalepa offered Goodpaster the opportunity to write a statement. Goodpaster asked if he first could have a cigarette break to consider. At 11:42 a.m., accompanied by SA Epperson and SA Walt, Goodpaster left the building to smoke a cigarette.

17. Goodpaster returned at 11:46 a.m. and began to draft his confession. At 12:07 p.m., he completed and signed it. SA Nalepa and SA Byrd signed the confession as well. Dkt. 33, Gov. Ex. 2.

PAGE 5 – OPINION AND ORDER

18. Goodpaster was then handcuffed, placed under arrest, and taken to the Multnomah County Detention Center.

19. On October 6, 2009, almost five years earlier, Goodpaster had signed a "Statement for Postmasters and Officers-in-Charge," certifying that he had read Subchapter 660 of the Employee and Labor Relations Manual ("ELM") and that he understood that if he violated it, he could be subject to administrative discipline and punishment under the law. Dkt. 33, Def. Ex. 3.

20. Subchapter 660 includes a provision requiring Postal Service employees to "cooperate" in USPS OIG investigations and a warning that failure to cooperate could result in "administrative discipline."

21. As SA Nalepa and Jami Goodpaster both testified, such discipline could include the loss of one's job with the USPS. SA Nalepa also testified that he knew of no postal employees who had been fired for not cooperating in an investigation.

22. At no point during the interview did any of the agents provide Goodpaster with a "*Garrity* warning." The USPS OIG policy, and the agents' practice, is to provide only *Miranda* warnings in custodial settings. Because Goodpaster was not free to leave, only the *Miranda* warning was given.

23. Jami Goodpaster, who was interviewed the same day, was provided with a form entitled "Acknowledgment of Rights (Garrity)." Dkt. 33, Gov. Ex. 10.

24. At no point during the interview of Eric Goodpaster did any of the agents say that Goodpaster had an obligation to cooperate, remind him of the possibility of sanctions for failing to cooperate, or in any other way threaten him with penalties for refusing to answer questions.

The Court finds credible the testimony of all the witnesses who testified at the October 29, 2014 evidentiary hearing and resolves any disputed facts as set forth above.

## CONCLUSIONS OF LAW

Goodpaster moves to suppress the statements he made during the custodial interrogation on April 9, 2014. He advances four principal arguments for suppression: (A) that his statements were involuntary under the Due Process Clause; (B) that he was interrogated in custody without being advised of his Fifth Amendment rights; (C) that the government, in its capacity as employer, threatened to penalize him for invoking his Fifth Amendment rights; and (D) that he was denied his Sixth Amendment right to counsel. The Court considers each of Goodpaster's arguments in turn. The first, second, and fourth of these arguments are unavailing, but the third, under *Garrity v. New Jersey*, has merit.

### A. Due Process Voluntariness

The use of a criminal defendant's involuntary statements against him at trial violates the Due Process Clause. *Mincey v. Arizona*, 437 U.S. 385, 398 (1978). The test for involuntariness is whether, under the totality of the circumstances, the "defendant's will was overborne." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Some of the circumstances commonly considered by the Supreme Court include the defendant's age, education, intelligence, and knowledge of his rights; the duration and nature of detention and questioning; and whether physical punishment was used or threatened. *Id.* Additionally, the Ninth Circuit has held that "leveraging a suspect's familial affections" may affect the voluntariness of his confession. *Brown v. Horell*, 644 F.3d 969, 982 (9th Cir. 2011).

Here, Goodpaster is an adult; he was employed as a United States postmaster or officer-in-charge, evincing his education and intelligence; he was informed of his rights; the interview lasted less than two hours; and physical punishment was neither used nor threatened. Although

these factors all tend to indicate that his confession was voluntary, Goodpaster argues that the reference to his wife sufficiently constituted a threat against his family to make his confession coerced. The facts of this case, however, bear little resemblance to those of cases in which coercion was found.

In *Horell*, an officer engaged the suspect in an extended discussion about whether he would be able to see his child in prison. *See id.* at 980-81. Similarly, in *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), several threats were combined to imply that if the defendant did not cooperate, "she would not see her young child for a long time." *Id.* at 1335-36. In those cases, the confessions obtained were held to be involuntary. By contrast, in *United States v. McShane*, 462 F.2d 5 (9th Cir. 1972), police officers took the defendant's girlfriend to the stationhouse for questioning; the defendant offered, in return for her release, to confess; and the officers accepted. *Id.* at 6. Because the officers neither expressly threatened to arrest the girlfriend nor bargained for a confession in exchange for her release, the Ninth Circuit held that the defendant's confession was voluntary. *Id.* at 7.

This case is closer to *McShane* than to *Horell* or *Tingle*. The agents here neither threatened to arrest Goodpaster's wife nor offered to release her in exchange for his confession. Agent Nalepa mentioned Goodpaster's wife one time, communicating only that she too was being questioned. That isolated, factually true comment was not sufficient to override Goodpaster's will and coerce him to confess. Goodpaster's confession was, for purposes of the Due Process Clause, voluntary.

## B.  The *Miranda* Warnings Under the Fifth Amendment

The Self-Incrimination Clause of the Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. When a person is questioned by the government, if a truthful answer might incriminate him in a future

criminal proceeding, the Clause provides him with the *privilege* to refuse to answer.[1] *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). Ordinarily, if the person does not assert the privilege at that time—if he simply answers the question—his answer is considered voluntary (that is, not "compelled") for purposes of the Fifth Amendment.[2] *Minnesota v. Murphy*, 465 U.S. 420, 429 (1984).

There are, however, exceptions to this general rule. For certain "well-defined situations" that are sufficiently likely to entail coercion, *id.*, the Supreme Court has "created prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause." *Chavez v. Martinez*, 538 U.S. 760, 770 (2003) (plurality opinion). Rather than ask whether statements were *actually* compelled, a prophylactic rule asks whether certain *other* conditions were met and provides that statements made under those conditions are deemed *per se* compelled. *See, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (describing the *Miranda* rule as creating a "presumption of compulsion" that is "irrebuttable for purposes of the prosecution's case in chief"). A prophylactic rule, therefore, "sweeps more broadly than the Fifth Amendment itself" and may exclude even "patently *voluntary* statements." *Id.* at 306-07 (emphasis in original).

Goodpaster raises two of these Fifth Amendment prophylactic rules. The first is the well-known rule of *Miranda v. Arizona*, 384 U.S. 436 (1966), which concerns statements made during

---

[1] Under the Supreme Court's precedents, what is commonly referred to as one's "right" to remain silent is more properly understood as a conditional privilege. *See* Laurence A. Benner, *Requiem For Miranda: The Rehnquist Court's Voluntariness Doctrine In Historical Perspective*, 67 Wash. U. L.Q. 59, 62 n.7 (1988).

[2] Of course, even one who has lost the privilege may still assert, as Goodpaster did, that his answer was actually coerced and involuntary in violation of the Due Process Clause. *See supra* Part A.

custodial interrogation. The second rule is delineated in a line of cases beginning with *Garrity v. New Jersey*, 385 U.S. 493 (1967). The *Garrity* rule, which will be discussed in Part C, applies when the government threatens to penalize the assertion of the Fifth Amendment privilege. Goodpaster's invocation of the *Miranda* rule, however, is unavailing.

The basic insight of *Miranda* is that custody contains "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. To offset this coercion, *Miranda* mandated that certain warnings be given before a suspect in custody is interrogated. *Id.* at 478-79. Absent these warnings, *Miranda* held, a suspect's statements made during custodial interrogation—even "patently *voluntary* statements"—may not be used against him in the prosecution's case-in-chief. *Elstad*, 470 U.S. at 307; *Miranda*, 384 U.S. at 478-79.

The prophylactic rule of *Miranda*, therefore, substitutes the totality-of-the-circumstances voluntariness inquiry with three simpler questions: First, was the suspect in custody?[3] Second, was he being interrogated?[4] If both of the first two conditions are met, then third, were adequate warnings given?[5] A suspect who confesses after he has been adequately advised of his Fifth Amendment rights will generally be deemed to have waived them. *See Berghuis v. Thompkins*, 560 U.S. 370, 385-86 (2010).

---

[3] *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (providing an overview of the custody inquiry).

[4] *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (defining "interrogation" as "either express questioning or its functional equivalent").

[5] *See California v. Prysock*, 453 U.S. 355, 359 (1981) (holding that "no talismanic incantation [is] required").

Here, the Government concedes that Goodpaster was in custody and that the interview amounted to interrogation. It asserts, however, that the agents administered *Miranda* warnings to Goodpaster almost immediately upon entering his office. At the evidentiary hearing, the Government supported this assertion with testimony from all three agents and the printed *Miranda* warning form signed and initialed by Goodpaster. Although in his written motion to suppress Goodpaster disputed the adequacy and timeliness of his *Miranda* warning, he put on no evidence at the hearing to contradict the Government's evidence on this matter.[6] Accordingly, the Government has met its burden of showing that Goodpaster had been adequately advised of his Fifth Amendment rights before he was questioned. *See Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) ("The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver . . . ." (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986))). Therefore, Goodpaster waived his *Miranda* rights by confessing. *Cf. Thompkins*, 560 U.S. at 385-86.

**C.  *Garrity* and Its Progeny**

The *Miranda* rule, however, is not the only way to bypass the compulsion inquiry. In a less-well-known line of cases[7] beginning with *Garrity v. New Jersey*, 385 U.S. 493 (1967), the Supreme Court has delineated a prophylactic rule parallel to that of *Miranda*: The government may not threaten substantially to penalize a person for asserting his Fifth Amendment privilege. *Minnesota v. Murphy*, 465 U.S. 420, 434 (1984); *Garrity*, 385 U.S. at 497-98. Where it has

---

[6] He also appears to have abandoned that argument in his supplemental briefing filed after the hearing. *See* Dkt. 34 at 2-3.

[7] Writing in dissent in 2007, Judge Alex Kozinski, then Chief Judge of the Ninth Circuit, observed that he "had no idea, even though [he had] been a government employee involved in law-related activities for almost three decades," about the *Garrity* rule and its progeny. *Aguilera v. Baca*, 510 F.3d 1161, 1179 (9th Cir. 2007) (Kozinski, C.J, dissenting).

threatened to do so, the government has created a "classic penalty situation," and any answers given by the suspect are "deemed compelled and inadmissible in a criminal prosecution." *Murphy*, 465 U.S. at 435.

### 1. Background: The Government in Dual Roles

In *Garrity*, a state employer questioning its employees informed them of their right to remain silent—and that if they exercised it, they would be fired. 385 U.S. at 494. Faced with the choice "either to forfeit their jobs or incriminate themselves," the employees confessed. *Id.* at 495, 497. The Court held that the state may not put its employees to such a choice and reversed their convictions. *Id.* at 497-98.

The *Garrity* rule has since been generalized to any situation in which the government seeks to "impose substantial penalties because a witness elects to exercise his Fifth Amendment privilege." *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977). Thus, "loss of job, loss of state contracts, loss of future contracting privileges with the state, loss of political office, loss of the right to run for political office in the future, and revocation of probation all are 'penalties' that cannot be imposed on the exercise of the privilege." *United States v. Frierson*, 945 F.2d 650, 658 (3d Cir. 1991) (collecting cases).

In each of these penalty situations, the government is playing two roles. One role is always law enforcer—police and prosecutor. Often, as in *Garrity*, the second role is employer, but it need not be. The key is that in these second roles, the state has special relationships with certain people—employees, probationers, and so on[8]—through which it can apply additional pressure to cooperate.

---

[8] In the remainder of this Opinion, this Court uses the employer–employee relationship as a synecdoche for all such relationships.

Corresponding to these dual roles, the Fifth Amendment principle implemented by *Garrity* can be implicated in two distinct contexts. In the more common scenario, the individual does not succumb to the state's pressure, but stands upon his privilege and maintains his silence; in this context, he appears as a civil plaintiff, seeking to prevent the government–employer from "mak[ing] good on its prior threat" by penalizing him. *Murphy*, 465 U.S. at 434. But sometimes, as in *Garrity* and *Murphy*, the individual succumbs to the pressure and discloses incriminating information; in this context, he appears as a criminal defendant, seeking to prevent the government–prosecutor from using his statements against him. *Murphy*, 465 U.S. at 434.

There is nothing inherently wrong with pressuring an employee to cooperate or punishing one who does not. Employers sometimes need information from their employees, and a private employer may fire an employee who refuses to answer. But when the employer is the state, the same information might be useful for prosecutorial purposes. In such a situation, the state's role as employer provides it with a means to penalize the exercise of the constitutional privilege against self-incrimination—a deed forbidden to it in its role as law enforcer. *See Griffin v. California*, 380 U.S. 609, 614 (1965) (forbidding any penalty that "cuts down on the privilege by making its assertion costly"). Thus, the Supreme Court faced a dilemma: fulfilling "the need fully to implement [the Fifth Amendment's] guaranty," *Gardner v. Broderick*, 392 U.S. 273, 276 (1968), without the hamstringing the government-as-employer's ability to "sensibly administer" its human resources. *See Murphy*, 465 U.S. at 435 n.7.

One year after *Garrity*, the Court resolved this constitutional dilemma in a pair of civil-context penalty cases in which the plaintiffs maintained their silence and later brought suit to bar the state from firing them. *Uniformed Sanitation Men Assoc., Inc. v. Comm'r of Sanitation*, 392 U.S. 280 (1968); *Gardner v. Broderick*, 392 U.S. 273 (1968). The Court reasoned as follows:

1. If the government grants a prospective witness use and derivative-use immunity, it is permitted to compel answers from him, even as prosecutor, "regardless of the privilege." *Gardner*, 392 U.S. at 276 (citing *Counselman v. Hitchcock*, 142 U.S. 547, 585-86 (1892); *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 (1964)).

2. A government employee questioned under threat of discharge is "entitled" to such immunity. *Gardner*, 392 U.S. at 278 (citing *Garrity*, 385 U.S. at 500).

3. Therefore, by virtue of that immunity, the government-as-employer is permitted to compel answers from an employee. *Gardner*, 392 U.S. at 278.

By this reasoning, the Supreme Court held, if a government employee refuses to answer questions "relating to the performance of his official duties, without being required to waive his immunity . . . the privilege against self-incrimination [is not] a bar to his dismissal." *Id.* at 278 (footnote omitted).[9]

Taken together, *Garrity* and *Gardner* stand for two related propositions: When the government threatens to punish an employee for silence, it has in effect elected to inhabit its role as employer. Thus, for any testimony it thereby secures, the employee has use and derivative-use immunity ("*Garrity* immunity") against the government as prosecutor.[10] When, however, the

---

[9] In both cases, however, the State *had* sought to compel the plaintiffs not only to answer questions, but also to waive any immunity to which they might otherwise be entitled. *Uniformed Sanitation*, 392 U.S. at 282-83; *Gardner*, 392 U.S. at 274-75 & n.3. The Court held that although the State was permitted to punish an employee for his silence, it was *not* permitted to punish him for refusing to waive his immunity. *Gardner*, 392 U.S. at 278. The Court declined to "speculate" whether an executed waiver would have been effective or what the effect would have been had the employee refused to waive but still testified. *Id.* at 278-79.

[10] *See also Lefkowitz v. Turley*, 414 U.S. 70, 84 (1973) ("Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use.").

employee receives or becomes entitled to use and derivative-use immunity against the government *as prosecutor*, he may not also claim immunity against the government *as employer*. Thus, if he keeps his silence, the government may carry out its prior threat.

### 2. *Garrity* as Prophylaxis

The *Garrity* Court reasoned that the choice between incriminating oneself and suffering the threatened penalty—in *Garrity*, the loss of one's job—is "the antithesis of free choice to speak out or to remain silent." 385 U.S. at 497. Accordingly, the *Garrity* rule, like *Miranda*, is prophylactic. *Chavez*, 538 U.S. at 768 & n.2 (plurality opinion) (observing that the "immunity [secured by *Garrity*] is . . . a prophylactic rule we have constructed to protect the Fifth Amendment's right from invasion"). Where the government has created a penalty situation, the inquiry is no longer whether the criminal defendant asserted his privilege when he was questioned (itself a proxy for whether his answer was compelled); instead, the privilege is said to be "self-executing" and may be claimed after the fact. *Murphy*, 465 U.S. at 436, 437; *see Salinas v. Texas*, 133 S. Ct. 2174, 2180 (2013) (plurality opinion) ("[T]hreats to withdraw a governmental benefit such as public employment sometimes make exercise of the privilege so costly that it need not be affirmatively asserted.").

### 3. *Minnesota v. Murphy* and the Penalty Threat

For the rule of *Garrity* to apply, the government must have created a penalty situation—it must have made some sort of threat. After all, if there is no threat—if the government applies no pressure as employer—then the employee has no need of prophylaxis against coercion. This analysis leads to the question: What sort of threat is sufficient to trigger the rule?

The Supreme Court began to answer this question in *Minnesota v. Murphy*, 465 U.S. 420 (1984), a criminal-context case involving the questioning of Marshall Murphy, a felon on probation. Under the terms of his probation, Murphy was required to report to his probation

PAGE 15 – OPINION AND ORDER

officer and to be truthful with her in all matters; failure to comply could result in his probation being revoked. *Id.* at 422. During one meeting, the probation officer questioned Murphy about a crime other than the one for which he was on probation; Murphy confessed and was prosecuted. *Id.* at 424-25. He then sought to suppress his statements, claiming that the threat to revoke his probation was sufficient to trigger the protection of *Garrity*.

The Supreme Court acknowledged that

> if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Id.* at 435 (footnote omitted). But Minnesota, the Court held, had not actually created a penalty situation. The Court employed two alternative analyses to reach that conclusion: a subjective inquiry into Murphy's state of mind, and an objective inquiry into a reasonable understanding of the probation conditions.[11] *Id.* at 437.

On the subjective inquiry, the Court looked to three factors. First, the Court noted the lack of "direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." *Id.* Second, the Court observed that Murphy had not been expressly informed in person that he would be so penalized. *Id.* at 438. And third, the Court pointed out that during the meeting, Murphy had in fact lied, in violation of his probation conditions, belying the contention that those same conditions compelled him to confess. *Id.*

On the objective inquiry, the Court noted that the requirement that Murphy be *truthful* did not encompass the "extra, impermissible step" of requiring that he *answer* all questions. *Id.*

---

[11] The Court expressly declined to choose between the two or to hold that both were necessary. *See Murphy*, 465 U.S. at 437 (holding that there was no penalty situation regardless "[w]hether [the Court] employ[ed] a subjective or an objective test").

at 436-37. Nor had any state court construed it that way, and Minnesota had submitted to the Court that it would not and could not seek revocation solely for refusing to answer incriminating questions. *Id.* at 437-38. The Court also noted that probation could only be revoked upon a hearing weighing the probationer's conduct against countervailing factors. *Id.* at 438. Accordingly, the Court held that even if Murphy subjectively "feared that assertion of the privilege would have led to revocation," such a fear would have been unreasonable. *Id.* at 439.

### 4. *Garrity* in the Ninth Circuit

The Ninth Circuit has continued to refine the penalty-situation rule in the years since *Murphy*. The leading criminal-context case is *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), which involved a probationer in very similar circumstances as Marshall Murphy. Like Murphy, Phata Saechao confessed a separate crime to his probation officer. Unlike Murphy, however, Saechao was required by his probation conditions not only to be truthful, but to "*answer all* reasonable inquiries." *Id.* at 1078 (quotation marks omitted) (emphasis in original).

The Ninth Circuit held that this difference was dispositive. Because "[f]ailure to answer a relevant inquiry regarding the conditions of probation would have justified the revocation of [Saechao's] probation," the state had created a penalty situation. *Id.* The government argued that unless the state "*explicitly* announce[d] that it [would] impose a penalty for the invocation of [one's] Fifth Amendment rights," no penalty situation was created. *Id.* at 1078-79 (emphasis in original). The Ninth Circuit disagreed, emphasizing the holding of *Murphy* that "a state creates a classic penalty situation if it 'expressly or *by implication*' suggests 'that invocation of the privilege would lead to revocation of probation.'" *Id.* at 1079 (quoting *Murphy*, 465 U.S. at 435) (emphasis added in original).

The leading penalty case from the civil context is *Aguilera v. Baca*, 510 F.3d 1161 (9th Cir. 2007). The plaintiffs, sheriff's deputies implicated in an assault allegation, declined to

answer questions in an internal-affairs investigation. *Id.* at 1165-66. Pursuant to the Sheriff's

Department's Manual of Policies and Procedures, which provided that the deputies had "an

affirmative duty to cooperate" with such an investigation and were subject to "administrative

discipline" for failing to cooperate, they were reassigned from street duties to station duties. *Id.*[12]

The deputies filed suit, claiming that they were forced to choose between giving a "voluntary,

non-immunized statement" and being penalized at work, in violation of the Fifth Amendment. *Id.*

at 1171.

The Ninth Circuit disagreed. Because the deputies "were not compelled to . . . waive their

immunity from self-incrimination . . . [or] even *asked* to waive their immunity," the court held

that punishing them for refusing to answer questions did not implicate the Fifth Amendment. *Id.*

at 1172 (emphasis in original). That is, their duty to cooperate and the possibility of a penalty for

refusing would have entitled them to *Garrity* immunity had they chosen to speak; therefore, per

*Gardner*, they could not also claim immunity from employment-related punishment for their

silence.[13] *See id.* at n.5.

---

[12] Although the court did not quote the Sheriff's Department's Manual directly, the
appellees' answering brief did: "Members have a duty to *cooperate* with investigators of the
Department . . . who are conducting a criminal investigation . . . ." *Appellees' Answering Brief*,
*Aguilera v. Baca*, 510 F.3d 1161 (9th Cir. 2007) (No. 05-56617), 2006 WL 3245148 (June 14,
2006) (emphasis added) (alterations in original).

[13] The court also stated that "the deputies were not compelled to answer the investigator's
questions," but immediately afterwards noted that "there may have been some initial coercion to
*cooperate and answer* questions." *Aguilera*, 510 F.3d at 1172 & n.5 (emphasis in original). The
court then clarified that its holding was grounded in the absence of "a triable issue of fact as to
whether the tandem requirement of *compelling* the officers to waive their Fifth Amendment
rights was met." *Id.* at n.5 (emphasis in original).

Finally, *United States v. Bahr*, 730 F.3d 963 (9th Cir. 2013), is noteworthy for its analysis of how *certain* a threatened penalty must be to give rise to a penalty situation.[14] The government, citing *United States v. Ramos*, 685 F.3d 120 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 567 (2012), argued that a penalty situation is created only when the state *guarantees* a penalty for asserting the privilege. *Bahr*, 730 F.3d at 967 n.4. But that rule, the Ninth Circuit held, was inconsistent with *Saechao*: As long as the state had provided that refusing to answer would be "grounds for . . . revocation," it had created a penalty situation. *Id.* (quoting *Saechao*, 418 F.3d at 1075) (alteration in original).

### 5.  The Executive Branch's Interpretation of *Garrity*

The executive branch, in a memorandum from the U.S. Department of Justice to federal prosecutors, has also provided an interpretation of *Garrity*. *See* Memorandum from Assistant Attorney General Christopher A. Wray, *Regarding the Increasing Role of the Offices of Inspector General, and Uniform Advice of Rights Forms for Interviews of Government Employees* (May 6, 2005) (Dkt. 33, Def. Ex. 5) [hereinafter Wray Memorandum]. The Wray Memorandum advises prosecutors that statements elicited "under the threat of losing . . . government employment," are

> effectively "immunized." This type of immunity will be found if an employee has an objectively reasonable belief that he or she will be disciplined if he or she refuses to answer questions. The risk of creating such immunity is particularly acute when interviews are conducted by Inspector General Agents because

---

[14] *Bahr* was a criminal-context case involving the consideration at sentencing of statements immunized by *Garrity*. After a 2003 conviction for third-degree rape, as part of his supervised release, Richard Bahr had been required to undergo a "'full disclosure' polygraph test." *Bahr*, 730 F.3d at 965. During that test, he made certain confessions. A decade later, the government sought to introduce those confessions at sentencing for a separate child-pornography conviction. *Id.* The court held that *Garrity* immunity "extend[s] to the sentencing phase of a criminal case." *See id.* at 965-66.

> they handle both criminal investigations and investigations that
> lead to administrative discipline.

*Id.* at 466 (internal page 2).

The executive branch's interpretation of *Garrity* is, of course, not binding on this Court, nor on the USPS OIG. But its interpretation largely accords with that of the Ninth Circuit—and warns particularly of the dangers present when government employees are interviewed by agents of an Office of Inspector General. It is, therefore, useful confirmation of this Court's analysis.

### 6.  Application

In this case, Goodpaster was subject to a regulation, 39 C.F.R. § 230.3(a), requiring that he "cooperate with all audits, reviews, and investigations conducted by the Office of Inspector General." The same regulation provides that "failing to cooperate . . . may be grounds for disciplinary or other legal action." He was also subject to a workplace policy that required him to "cooperate in any postal investigation, including Office of Inspector General investigations" and that provided for "appropriate disciplinary measures" should he not cooperate. ELM §§ 665.3, 665.6.

An order to "cooperate" demands more of the reasonable employee than an order merely to be "truthful." *Cf. Murphy*, 465 U.S. at 437 (observing that "Murphy's probation condition [to be truthful] proscribed only false statements"). At the same time, it does not *clearly* communicate that that the employee must "answer all" questions. *Cf. Saechao*, 418 F.3d at 1078. But such a clear-statement rule is foreclosed by *Saechao*, which several times stressed that threatening a penalty "*by implication*" is sufficient to create a penalty situation. *See id.* at 1076, 1077, 1079, 1080 n.6 (quoting *Murphy*, 465 U.S. at 435) (emphasis added in original). As in both *Saechao* and *Bahr*, had Goodpaster remained silent, the regulation and the ELM here "would have justified" his employer (the USPS) firing him. *Cf. id.* at 1078; *Bahr*, 730 F.3d at 967 n.4.

Thus, there is a "reasonable basis for concluding that [the USPS] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Cf.* *Murphy*, 465 U.S. at 437. Objectively, therefore, these provisions created a penalty situation.

*Murphy* undertook both an objective and a subjective analysis, but it expressly declined to decide whether one or the other or both were necessary. *See supra* note 11. The Ninth Circuit in *Saechao* barely discussed the subjective inquiry, and in *Bahr* elided it entirely. In Goodpaster's case, the evidence for Goodpaster's subjective fear is at most equivocal.[15] Because *Murphy* does not mandate the subjective inquiry and the Ninth Circuit appears to have abandoned it, the Court makes no factual finding as to Goodpaster's subjective fear, but instead follows recent Ninth Circuit precedent not treating that factor as dispositive in finding that a penalty situation was created.[16]

Where the state has created a penalty situation but wishes to elicit testimony for use in criminal proceedings, it has an easy and effective remedy: Retract the employment-related threat that created the penalty situation. The state need only assure the employee, before it questions him, that he will not be punished solely for asserting his Fifth Amendment privilege. This simple remedy, frequently styled a "*Garrity* warning" in mimicry of the *Miranda* warnings, has been recognized by both the executive branch and the federal courts. *See* Wray Memorandum at 466

---

[15] Because Goodpaster did not testify at the evidentiary hearing, there is no direct evidence that he subjectively feared a penalty for remaining silent. But there *is* evidence that Goodpaster feared for his continued employment: among his first responses upon being interrogated, he asked about the MSPB, a board that handles employee disciplinary actions. And although no threat was communicated to Goodpaster by the agents during the interview, there *is* evidence that Goodpaster was aware of the threat, at least as of 2009 when he affirmed that he had read and understood the relevant provision and penalties. Dkt. 33, Def. Ex. 3.

[16] In addition, a subjective-fear requirement appears relevant more to an actual-coercion inquiry than to a prophylactic rule. *Cf. Chavez*, 538 U.S. at 768 n.2, 770 (noting that the immunity provided by *Garrity* is a prophylactic safeguard for the right against compelled self-incrimination).

("[W]hen a federal employee is interviewed . . . by an Office of Inspector General, the agents should provide the employee with an advice of rights form . . . commonly referred to as the '*Garrity*' warning.");[17] *United States v. Palmquist*, 712 F.3d 640, 643-46 (1st Cir. 2013) (denying suppression because the U.S. Department of Veterans Affairs OIG agent provided a sufficient *Garrity* warning).

The Supreme Court has not yet had occasion to decide what constitutes an effective *Garrity* warning. *Cf. California v. Prysock*, 453 U.S. 355, 359 (1981). But the government has several variations at its disposal. The U.S. Department of Justice offered the following model warning in an attachment to the Wray Memorandum:

> This is a voluntary interview. Accordingly, you do not have to answer questions. No disciplinary action will be taken against you solely for refusing to answer questions.

Wray Memorandum at 468. The U.S. Department of Veterans Affairs OIG, to which SA Epperson belongs, provides the following, somewhat narrower warning:

> If you refuse to answer the questions posed to you on the grounds that the answers may tend to incriminate you, you cannot be removed (fired) solely for remaining silent; however, your silence can be considered in an administrative proceeding for any evidentiary value that is warranted by the facts surrounding your case.

*United States v. Palmquist*, 712 F.3d 640, 644 (1st Cir. 2013) (quoting the form used by the U.S. Department of Veterans Affairs in that case). Indeed, the USPS OIG itself has a form entitled

---

[17] Later U.S. Department of Justice advice regarding *Garrity* warnings accords with the Wray Memorandum. *See* Letter from Assistant Attorney General Alice S. Fisher to Gregory H. Friedman and Barry R. Snyder (Jan. 11, 2006) (Dkt. 35-1) (advising that "the use of *Garrity* warnings whenever inspector general agents conduct interviews of government employees . . . is the best and preferred practice"); Memorandum from Assistant Attorney General Leslie R. Caldwell, *Guidance Regarding Criminal Investigations of Scheduling Practices at Veterans Affairs Hospitals*, at 3 (July 16, 2014) (Dkt. 35-2) ("OIG agents should be encouraged to use the *Garrity* warning form as broadly as possible.").

"Acknowledgement of Rights (Garrity)," which is substantively similar to the U.S. Department of Justice's model form. *See* Dkt. 33, Gov. Ex. 10.

The Court makes no holding with regard to the precise form of words sufficient to nullify a penalty situation. But an assurance that adequately retracted the state's prior threat would have permitted the Government to use Goodpaster's statements in a criminal prosecution. No such assurance, however, was given here.

### 7. Arguments Against Suppression

The Government raises several arguments against suppression. First, the Government argues that the Court should apply an entirely different test, found in *United States v. Indorato*, 628 F.2d 711 (1st Cir. 1980): whether "(1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment . . .; and (2) there is a statute or municipal ordinance mandating such procedure." *Id.* at 716. But the First Circuit's decision in *Indorato* predated the Supreme Court's decision in *Murphy*. To the extent that *Murphy* and *Indorato* are inconsistent, *Indorato* is no longer good law.

With regard to the first *Indorato* factor, the Supreme Court in *Murphy* did not find dispositive the fact that Murphy had not been explicitly threatened in person; rather, the Court considered it as only one of three factors in the subjective analysis, which itself was one of two alternative rationales for the holding. *See Murphy*, 465 U.S. at 437-38. On the second *Indorato* factor, *Murphy* is to the contrary: rather than ask whether the statute *mandated* a penalty, *Murphy* inquired merely whether "the State, either expressly or by implication, assert[ed] that invocation

of the privilege would lead to [a penalty]." *Id.* at 435. If it did, "the [suspect's] answers would be deemed compelled and inadmissible in a criminal prosecution."[18] *Id.*

Second, the Government argues that the threat of "administrative discipline" was insufficiently "specific" to create a penalty situation. It is true that the threatened penalty must be both "sufficiently coercive" and "more than merely hypothetical." *United States v. Antelope*, 395 F.3d 1128, 1138 (9th Cir. 2005). On the other hand, witnesses for both parties testified that "administrative discipline" could include loss of job, and Goodpaster argues that the threat of administrative discipline imposed "no limit" on the penalty he might have faced. This argument accords with the holding of *Saechao* and *Bahr*: the key is whether the prior threat "would have justified" a sufficiently coercive penalty, as indeed it did here. *See Saechao*, 418 F.3d at 1078, 1079 (inquiring, similarly, whether silence would have constituted "grounds for" a sufficiently coercive penalty); *Bahr*, 730 F.3d at 967 n.4.

Third, the Government argues that, consistent with USPS OIG policy, when the *Miranda* warning is provided to suspects who are in custody, the *Garrity* warning is unnecessary. But in *Garrity* itself, the suspects were given *Miranda* warnings. 385 U.S. at 494. Those warnings were insufficient in that case; they are no more sufficient here. Informing a suspect who is a government employee that he has the right to remain silent does not communicate that he may exercise that right without forfeiting his government employment. *See Garrity*, 385 U.S. at 499. The Wray Memorandum recognized as much when it advised that in addition to a *Garrity*

---

[18] The Government also argues that the Ninth Circuit adopted the *Indorato* test in *Aguilera v. Baca*, 510 F.3d 1161 (9th Cir. 2007). But *Aguilera* does not cite *Indorato*, or any other case from the First Circuit. Nor does *Aguilera* adopt the *Indorato* test in substance. Indeed, no Ninth Circuit appellate decision cites *Indorato*. Two district courts in the Ninth Circuit have, *see United States v. Seaux*, 2012 WL 3647742 (S.D. Cal. Aug. 23, 2012); *Orozco v. Cnty. of Monterey*, 941 F. Supp. 930, 939 (N.D. Cal. 1996), but those cases are not binding on this Court.

warning, "[i]n custodial interviews, of course, the employees should *also* be provided with *Miranda* warnings." Wray memorandum at 466 (emphasis added).[19]

### 8.  Lessons from *Aguilera*

The Court's conclusion is bolstered by the Ninth Circuit's holding in *Aguilera*, which in many ways is on all fours with this case, except that the employees there chose to remain silent. Although criminal-context penalty cases and civil-context cases such as *Aguilera* involve very different litigation circumstances—such as the individual appearing as a civil plaintiff instead of as a criminal defendant—the two contexts are simply different lenses on a single *ex ante* set of facts, differentiated only by the individual's critical choice "to speak out or to remain silent." *See Garrity*, 385 U.S. at 497. Thus, considering the counterfactual—the outcome if the individual had made the opposite choice—can shed valuable light.

In *Aguilera*, the plaintiff police officers were questioned under similar circumstances—a "duty to cooperate" and the threat of "administrative discipline." *See* 510 F.3d at 1165; *supra* note 12. The Ninth Circuit held that punishing them for remaining silent did not implicate the Fifth Amendment. *See id.* at 1172. Under the reasoning of *Aguilera*, therefore, had Goodpaster chosen to maintain his silence, his discharge would not have offended the Fifth Amendment. If, in addition, his statements were admissible in a prosecution, then *ex ante*, he would indeed have

---

[19] In a similar vein, the Government argues that the presence of an agent from another governmental agency should have been sufficient to inform Goodpaster that the investigation was criminal rather than administrative and thereby nullify the threat of a penalty. Not only does that argument charge Goodpaster with knowledge of the internal USPS OIG policy against involving outside agents in administrative investigations, it also requires him to traverse the long chain of inferences running from that policy through Supreme Court caselaw to the proposition that he would not be penalized solely for remaining silent. Placing that burden on Goodpaster is unsupportable when the Government could have efficiently and effectively nullified the threat by explicitly providing a *Garrity* warning.

faced the forbidden choice "between self-incrimination or job forfeiture." *Garrity*, 385 U.S. at 496. Under the rule of *Garrity* and its progeny, that cannot be so.

To summarize, when a government employee is questioned by his employer, the Constitution does not require the government affirmatively to announce "[w]hether [it] is wearing one hat or the other (or both)." *See Aguilera*, 510 F.3d at 1172 (majority opinion); *id.* at 1175 (Kozinski, C.J., dissenting). But here, by threatening to punish Goodpaster's silence (and not retracting that threat), the Government donned the hat of employer. The Constitution holds it to that choice. Goodpaster's statements are suppressed.

## D.  The Sixth Amendment

Goodpaster also argues that his Sixth Amendment right to counsel was violated because he was not told that he was under indictment before he waived his *Miranda* rights. Goodpaster has cited no authority for that proposition, and the Court has not made a factual finding as to whether the agents told Goodpaster that he had been indicted. In light of the Court's holding on the penalty issue under *Garrity*, the Court declines to address this argument.

## CONCLUSION

Under the facts presented, the Government created a "classic penalty situation" by threatening to punish Goodpaster for remaining silent. Accordingly, under the Supreme Court's decision in *Garrity v. New Jersey* and its progeny, Goodpaster's statements must be suppressed. Goodpaster's motion (Dkt. 21) is GRANTED.

**IT IS SO ORDERED**.

DATED this 1st day of December, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge